### In re PITTSBURGH CORNING CORPORATION, Debtor.

#### No. 00–22876–JKF.

United States Bankruptcy Court, W.D. Pennsylvania.

April 27, 2004.

Related to Dkt. No. 2345, Application to Employ Gilbert Heintz & Randolph LLP as Special Insurance Counsel to the Official Committee of Unsecured Asbestos Creditors and the Future Claimants' Representative Pursuant to § 1103(a), 9/15/03 Agenda Item 9

Related to Dkt. No. 2409, Motion to Compel Production of Documents (Number Two) Filed by Lumbermens Mutual Casualty Company, 9/15/03 Agenda Item 8

JUDITH K. FITZGERALD, Chief Judge.

## MEMORANDUM OPINION [1]

*Introduction*

Before the court is the application of the Asbestos Creditors Committee ("ACC")

---

1. This Memorandum Opinion constitutes our findings of fact and conclusions of law. The question was raised at a hearing before the Motion to Employ Gilbert Heintz & Randolph was filed whether court approval of GHR's employment is necessary inasmuch as a non- debtor third party, PPG Industries, Inc., will be paying GHR. *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99 (3d Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988), and *Matter of Arkansas, Co., Inc.*, 798 F.2d 645 (3d Cir.1986), require court approval for

and the Future Claimants' Representative ("FCR") to employ Gilbert, Heintz & Randolph LLP ("GHR") as special insurance counsel. Various insurance entities have objected: Lumbermens Mutual Casualty Company, Dkt. No. 2454, Westchester Fire Insurance Company, Dkt. No. 2475, and Century Indemnity Company, Dkt. No. 2515.[2] The general basis for the objections is that GHR is not disinterested and has a conflict of interest.

On June 12, 2003, Lumbermens moved to disqualify GHR as counsel for the ACC and the FCR (the "Claimant Entities") based on a conflict of interest arising from a violation of Rule 1.9 of the Pennsylvania Rules of Professional Conduct. *See* Dkt. No. 2231. The issues raised by the motion to disqualify, which was denied without prejudice as premature by order dated July 22, 2003, Dkt. No. 2351, and the application to employ GHR filed July 28, 2003, are identical. GHR formerly represented Corning, Incorporated ("Corning"), one of Debtor's two shareholders, in matters regarding its asbestos insurance coverage. GHR now seeks to represent the ACC, the FCR, and the Asbestos PI Trust that is to be created if and when Debtor's plan is confirmed. The plan as filed contains an injunction in favor of Corning due to its contribution to the Asbestos PI Trust.

During the course of plan negotiations, the ACC, with the FCR's knowledge and consent, accepted an assignment from PPG of PPG's claims against unsettled, disputed insurance coverage that is available for asbestos-related personal injury claims. The ACC, also with the FCR's knowledge and consent, negotiated a commitment from PPG to pay insurance counsel chosen by the ACC to provide legal services with respect to pursuit of PPG's insurance coverage.[3] Again with the FCR's knowledge and consent, the ACC chose GHR. GHR also represents PPG, Inc., Debtor's other shareholder, regarding its asbestos insurance coverage but that representation is not at issue.

Corning asserts that it executed a "limited" waiver of the alleged conflict in June of 2003 and that GHR never acquired confidential information about the underlying individual asbestos suits. Lumbermens did not provide Corning with confidential information. In connection with its objection to the application to employ GHR, however, Lumbermens submitted an " 'Updated Privilege Log of GHR Documents' provided in connection with the Subpoena Duces Tecum served by Lumbermens ... upon [GHR] on July 2, 2003."

---

the retention of counsel for certain parties in a bankruptcy case, regardless of who pays the fee. *Cf. In re Shuma*, 1996 WL 377154, Nos. 93–20889, 84–21820 (Bankr.W.D.Pa., July 3, 1996)(court rejected assertion that counsel was not required to file the statement of attorney fee required by 11 U.S.C. § 329(a) because fee was being paid by nondebtor third party). *See* 11 U.S.C. § 1103, Fed.R.Bankr.P.2016.

2. Westchester Fire Insurance Company also joined in Century Indemnity's objection. PPG Industries, Inc., Dkt. No. 2466, filed a response but did not articulate its concerns, stating that it anticipated they would be addressed before the hearing on the application to employ. PPG reserved the right to be heard at the hearing if the concerns were not

addressed. Counsel for PPG stated at the hearing on September 15, 2003, that its concerns had "mostly" been resolved. Transcript of 9/15/03 at 7.

3. The retention application states that the ACC wanted to have counsel paid in a manner that would not constrain efforts to maximize potential insurance recoveries and "to demonstrate to the non-settling insurers that all necessary resources would be available" to the proposed Asbestos PI Trust to pursue PPG's insurance coverage. *See* Application for an Order Authorizing Retention ... of Gilbert Heintz & Randolph LLP as Special Insurance Counsel ..., Dkt. No. 2345, at ¶ 8.

Lumbermens asserts that it must consent to GHR's proposed representation of the ACC and the FCR (and the Asbestos PI Trust in the future) inasmuch as it shares a common interest in Corning's underlying defense and the privileges that attach thereto. *See* Lumbermens Mutual Casualty Company's Objection to the Application of the Official Committee of Asbestos Creditors and Future Claimants' Representative to Retain Gilbert Heintz & Randolph LLP as Special Insurance Counsel ("Lumbermens' Objection to GHR Retention Application"), Dkt. No. 2454, at 12. Despite standing to raise the conflict, we find that the common interest or joint defense doctrine does not apply to Lumbermens and, therefore, its consent is not needed.

Nonetheless, we find that GHR cannot be employed as a professional in this case. *See* 11 U.S.C. §§ 327, 1103. It is not disinterested, has an actual conflict of interest, or, at a minimum, a potential conflict of interest, and holds an interest adverse to the estate insofar as it purports to undertake representation of those who have claims against its former client, Corning, a shareholder of the Debtor, PCC. Further, we find that GHR's stated belief that the representation of the Claimant Entities will not adversely affect GHR's relationship with Corning is not reasonable.

Lumbermens also filed a motion to compel production of documents with respect to the motion to employ GHR. To the extent the ACC and the FCR agreed to produce documents, the motion will be granted. To the extent the motion to compel is based on the common interest/joint

defense theory it is denied. Although some of the discovery requested is directed to the question of when GHR began its representation of the ACC and the FCR (i.e., while it was still representing Corning), in light of our ruling that the motion to retain GHR will be denied, we do not reach this issue.[4]

*Standing*

■ GHR contends that Lumbermens is without standing to raise this objection. We conclude that, under 11 U.S.C. § 1103, Lumbermens, although not a former or current client of GHR, has standing through its counsel to object to the application to employ GHR inasmuch as actual and potential conflicts of interest exist between GHR's former and current (proposed) clients.[5] Although Lumbermens was never GHR's client, Lumbermens' counsel, as an officer of the court, is required to report an actual or potential conflict of interest to the court under Pennsylvania Rules of Professional Conduct.

Lumbermens' counsel has standing to object to the application to employ GHR. Any attorney, not just a former client's attorney, has standing, and, indeed, the obligation, to call a conflict of interest to the attention of the court because attorneys must report any actual or potential ethical violations. *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 1994 WL 62124 (D.N.J., Feb.23, 1994) at *5. In *Schiffli*, the firm of P & G represented the plaintiff's trustees and a third-party defendant in a suit against Ryan Beck. Ryan Beck's counsel moved to disqualify P & G as counsel for the plaintiff's trustees based on a potential conflict

---

4. We also note that Lumbermens seeks discovery of drafts of certain letters and pleadings from GHR. Lumbermens has no standing to pursue discovery from GHR; only to raise GHR''s conflict of interest.

5. With respect to potential conflicts, see *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir.1998).

of interest. The United States District Court for the District of New Jersey held that counsel for Ryan Beck had standing to file a disqualification motion because, under New Jersey's Rules of Professional Conduct, Ryan Beck's counsel was required to report actual or potential ethical violations to the court so had standing. Lumbermens' counsel is in the position of Ryan Beck's counsel. Applying the rule in *Schiffli*, Lumbermens has standing to object to GHR's retention as counsel for the Claimant Entities.

The Court of Appeals for the Third Circuit in *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157 (3d Cir.1984), *cert. denied sub nom. Cochrane & Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), raised, but did not resolve, the issue of whether only a client or former client could move for disqualification. Other circuits have held that attorneys are required to report actual or potential ethical violations. *See Schiffli*, 1994 WL 62124 at *2, citing *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir.1984); *U.S. v. Clarkson*, 567 F.2d 270 (4th Cir.1977); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671 (5th Cir.1977).

Rule 1.7 of the Pennsylvania Rules of Professional Conduct provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after full disclosure and consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

The comment to Pennsylvania Rule of Professional Conduct 1.7 provides that "where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question."[6] We find this standard is met in this case.

*Facts*

Over 140,000 individuals filed asbestos-related claims against Pittsburgh Corning Corporation ("PCC") prior to PCC's April 2000 bankruptcy filing. Some individuals (approximately 11,400) also filed claims against Corning. *See* Disclosure Statement at 43, Dkt. No. 2065, filed April 30, 2003. The ACC is composed of individual asbestos claimants in the suits.[7] Corning retained tort counsel, (Nixon Peabody LLP), insurance counsel (Ward Norris Heller and Reidy LLP), and bankruptcy counsel (Thorp Reed & Armstrong LLP and Shearman & Sterling LLP). Around March 1, 2001, Corning also retained Gilbert Heintz & Randolph LLP ("GHR") as its supplementary insurance coverage counsel to settle insurance coverage dis-

---

6. The Comment advises that "[s]uch an objection should be viewed with caution... for it can be misused as a technique of harassment." We find no indication of harassment on the record before us.

7. Counsel for the claimants take an active role on behalf of their clients with respect to the ACC.

putes between Corning and Corning's primary insurers, Lumbermens Mutual Casualty Company ("Lumbermens") and ACE USA Companies ("ACE"). The following events illustrate GHR's role.

In June 2001, Corning's counsel, including Scott Gilbert of GHR, Andrew Burns of Nixon Peabody and Cheryl Heller of Ward Norris, met with Lumbermens and ACE to discuss coverage-related topics, Corning's defense strategies against the Claimant Entities and Corning's willingness to contribute to a § 524(g) trust. At the meeting, Mr. Gilbert obtained a 24-page confidential memo prepared by Mr. Burns, Corning's tort counsel, and marked "Privileged and Confidential/Attorney Work Product/Attorney–Client Communication." The memo contained detailed facts and law relating to the Unibestos-related claims against Corning.[8]

On September 27, 2001, Lumbermens sent Ms. Heller, Corning's insurance counsel, a letter marked "Confidential–For Settlement Purposes Only" that denounced Corning's intentions to contribute to the trust. GHR received this letter six months later.

On May 1, 2002, Lumbermens called Ms. Orr of GHR to discuss the following: (i) the ACC's demands of Corning; (ii) Lumbermens' involvement in discussions between the ACC and Corning; (iii) Lumbermens' interest in keeping abreast of negotiations between Corning and the ACC; and (iv) Lumbermens' September 2001 settlement letter. Two weeks later, Ms.

Orr met with Lumbermens to try to convince it to contribute to the trust to settle its coverage obligation to Corning. Lumbermens refused and continues to refuse to do so.

In June, 2002, GHR met with Lumbermens and ACE to discuss: (i) the status of Corning's negotiations with the ACC; (ii) Corning's defense strategies; (iii) Corning's demands on its insurers; and (iv) the insurers' role in handling the Claimant Entities' demands. Also in June of 2002 Scott Gilbert of GHR acknowledged that GHR had been asked to serve as PPG's insurance counsel for a fee of $30 million to be paid by PPG. *See* Letter of June 10, 2002, from Scott D. Gilbert to James C. Diggs, Senior Vice President and General Counsel of PPG Industries, Inc., LMC Deposition Exhibit 8, GHR 0106.

On or about March 28, 2003, Corning settled with the Claimant Entities, resolving its asbestos liability and assigning insurance rights against Lumbermens and ACE to the trust. The settlement is contingent on the confirmation of the proposed plan of reorganization. Corning orally consented to GHR's representation of the Claimant Entities on or about the same date, and then signed a formal limited waiver in June of 2003. Neither GHR nor the Claimant Entities filed an application to employ GHR until July 28, 2003.[9] GHR denies that its representation of the ACC and the FCR began before December of 2002.[10] Lumbermens asserts that

---

**8.** Unibestos and Corhart are asbestos-containing products.

**9.** GHR's representation of the ACC and the FCR came to the court's attention when Lumbermens filed a motion to disqualify GHR as counsel to the ACC and the FCR. Inasmuch as GHR had never filed a motion to be employed and no order had been entered approving its employment, the court advised GHR to cease representation until an application to employ

was filed. We admonished GHR that if a conflict was found, it would be at risk for fees. *See F/S Airlease II, Inc. v. Simon,* 844 F.2d 99 (3d Cir.1988); *Matter of Arkansas, Inc.,* 798 F.2d 645 (3d Cir.1986)(no payment is permitted absent an order approving retention).

**10.** There is a dispute with respect to when GHR actually began its representation of the ACC and the FCR. *See infra.* As early as May of 2002 GHR was discussing with the ACC

there were meetings between April and June of 2002 at which no carriers were present, but GHR was there as were the ACC and Corning. These meetings are referred to by the parties as "the Mc-Govern meetings." GHR represented Corning in the negotiations during the Mc-Govern meetings but asserts that it was not party to the final negotiations leading to the settlement Corning reached with the ACC and the FCR. One of the meetings was held on June 10, 2002, after a settlement with PPG[11] was announced but before Corning reached a deal with the ACC. Although GHR says it did not participate in the final negotiations, it is apparent from the record that it participated in other negotiations and was still holding itself out as and known to the parties to be Corning's counsel at the time those final negotiations occurred.

The date on which GHR began its work on behalf of the ACC and the FCR is in dispute. In pleadings in support of the retention application it is asserted that no work was done until work for Corning ceased. GHR avers that this was no earlier than December 2002 but in his Verified Statement Scott Gilbert states

As part of the settlement between PPG and the ACC on May 14, 2002, PPG agreed to fund ... insurance counsel designated by the ACC to continue to pursue the insurance coverage issued by certain PPG insurance companies that refused to participate in the settlement. The ACC, with the knowledge and consent of the FCR, designated GHR as its choice for insurance counsel.

I negotiated with PPG and its counsel about the scope and terms of GHR's retention ... [which] were included in the PCC Disclosure Statement filed April 30, 2003. By May 23,2003, GHR and PPG, along with the other parties thereto, had finalized the Term Sheet....

On December 5, 2002, GHR began doing preliminary insurance work on behalf of the ACC against PPG's insurers. GHR did not undertake any work on behalf of the ACC against Corning's insurers. At that time, Corning had no agreement with the ACC to resolve its asbestos-related personal injury claims by participation in the [Asbestos PI] Trust. Therefore, GHR's employment by the ACC did not include advice with respect to resolution of any Corning insurance policies.

and/or the FCR the possibility of representing them. *See* Transcript of Video Deposition of Scott D. Gilbert dated July 18, 2003, at 161, 164. Mr. Gilbert testified that as of October 2002 details of the proposed engagement remained to be finalized and that occurred around April or May of 2003. Mr. Gilbert also testified that GHR did some "preliminary work" on behalf of the ACC at the end of 2002 but that the firm was not compensated for this work. *Id.* at 165.

11. The ACC and the FCR reached an agreement with PPG whereby PPG would pay a flat fee ($30 million) to GHR to represent the postconfirmation Asbestos PI Trust in the pursuit of insurance that PPG was assigning to the trust. In the meantime, GHR would represent the ACC and the FCR. Whether GHR

would represent the Asbestos PI Trust would be decided by the Asbestos PI Trust. *See also* Lumbermens Mutual Casualty Company's Objection to Application ... to Retain [GHR] as Special Insurance Counsel, Dkt. No. 2454, at 7, n.5. Corning's Response and Objection to Lumbermens Mutual Casualty Company Interrogatories (Set No. One), Directed to Corning Incorporated is attached to Lumbermens' objection to the application to retain GHR and states that "[u]pon information and belief, GHR last rendered substantive legal services to Corning on or about July 23, 2002. Subsequent to July 23, 2002, there were one or perhaps two short telephone calls with GHR in October 2002 and a brief telephone call with GHR on March 26, 2003." *Id.* at 8, Response to Interrogatory No. 4.

Verified Statement of Scott D. Gilbert, Exhibit to Retention Application, Dkt. No. 2345, at ¶¶ 20, 21, 22. The above statements seem to indicate that GHR was working for the ACC and Corning simultaneously but for purposes of this Memorandum Opinion we do not need to resolve the issue inasmuch as we find that GHR has a conflict of interest and the retention application filed by the ACC and the FCR must be denied.

■ With respect to the retention, Mr. Gilbert states in ¶ 23 of his Verified Statement that on behalf of the ACC and the FCR, GHR will pursue Corning Plan Insurance Policies but that his judgment will not be hindered by GHR's prior representation of Corning. This self-serving statement ignores the problem. GHR received confidential information from Corning regarding its defense strategies in suits filed by asbestos plaintiffs. GHR cannot now change allegiance and advocate for the representatives of those asbestos plaintiffs when it previously represented Corning, the putative defendant in the suits.

That GHR's advice would be directed to the Asbestos PI Trust after plan confirmation if the Asbestos PI Trust retained GHR does not resolve the issue as a conflict of interest exists with respect to the Asbestos PI Trust as well. The duties of the Asbestos PI Trust trustees will include examining asbestos claims to determine the extent to which they should be paid or disallowed, paying appropriate claims, and pursuing applicable insurance coverage. This situation presents an actual conflict— GHR cannot undertake the representation of the ACC, the FCR or the Asbestos PI Trust regarding Corning's non-settling insurers..

We also note that in his deposition Mr. Gilbert testified that as early as October 4, 2002, GHR had been designated as the ACC's "counsel of choice" to pursue PPG, Transcript of Video Deposition of Scott D. Gilbert dated July 18, 2003, at 160–61, although as of November 18, 2002, some details remained to be resolved. *Id.* at 164. In GHR's Brief in Opposition to Lumbermens Mutual Casualty Company's Motion to Disqualify, Dkt. No. 2281, GHR asserted that on October 4, 2002, GHR

met with representatives of the ACC and the FCR with respect to Corning-related matters. At a break at one of Corning's ongoing mediation sessions at which GHR was not present, representatives of the ACC and FCR asked if they could meet with Gilbert to discuss Corning's insurance coverage. According to these representatives, Corning and its insurers present at the mediation consented to the conversation, which lasted 80 minutes. At all times during this conversation, Gilbert acted as Corning's insurance coverage counsel. He had no legal relationship, formal or informal, with the ACC, FCR, or the proposed [Asbestos PI] Trust.

Dkt. No. 2281 at 7–8.[12]

"Preliminary review" work on behalf of the ACC and the FCR had begun "at the very end of 2002 and following." Transcript of Video Deposition of Scott D. Gilbert dated July 18, 2003, at 164–65. However, Bette Orr of GHR asserts that this was with respect to PPG's insurers. Declaration of Bette M. Orr, Exhibit H to Lumbermens Mutual Casualty Company's Motion to Compel the Production of Documents (Number Two), Dkt. No. 2409, at ¶ 6. At that time there was no agreement

---

12. We note that the title of Docket No. 2281 in the docket entry does not match the title of the Brief in Opposition that was filed at that docket number. This makes it very difficult to locate the pleading on the docket. We were able to do so after considerable searching, however, and verified that the document at Docket No. 2281 is the brief in question.

between the ACC and Corning with respect to resolving Corning's asbestos liability through participation in the Asbestos PI Trust. *Id.* The record before us establishes that Corning was aware of the proposed representation of the ACC and the FCR by GHR at least by March 25, 2003. *See* LMC Deposition Exhibit 14, at 2, GHR 0657, Letter of March 26, 2003, from William D. Eggers of Corning to Joseph F. Rice of the Ness Motley firm. Mr. Eggers wrote, "If the document is acceptable to the ACC, I am prepared to sign for Corning. . . . As a final matter, we agree that Scott Gilbert and his firm may be available to the ACC as insurance counsel with respect to the rights/proceeds that will be assigned." *Id.*

For purposes of this Memorandum Opinion, although it appears that simultaneous representation by GHR occurred, we do not need to decide whether or not it did inasmuch as we find that there was an actual conflict of interest between GHR's former and current clients and its retention cannot be approved. GHR, as Corning's counsel, was involved in discussions regarding Corning's defense strategies against the Claimant Entities, GHR's proposed current clients. The issues that those discussions centered around are the same issues that will arise with respect to the Asbestos PI Trust administration and the interests of the ACC's and FCR's constituencies. Furthermore, if the plan is not confirmed, the Corning settlement will not become effective and Corning and the Claimant Entities will be in the same adversarial position they were in before the settlement.

*The Corning Waiver*

Although Corning waived the conflict, the waiver was limited in scope and an actual conflict remains. GHR acknowledges that the "possibility" of a conflict exists. *See* Letter of June 11, 2003, from

Scott D. Gilbert of GHR to William Eggers, Senior Vice President and General Counsel of Corning Inc., LMC Deposition Exhibit 20, GHR 0296, attached as an exhibit to Lumbermens' Objection to GHR Retention Application.

The June 11, 2003, letter was a precursor to the limited waiver that was signed on June 20, 2003 (LMC Deposition Exhibit No. 22, GHR 0397). In the June 11 letter Mr. Gilbert wrote:

> Although we do not anticipate that the Claimant Entities will take positions materially adverse to Corning on issues that are substantially related to our prior representation of Corning, namely insurance recovery for asbestos-related claims, such a possibility exists, and we therefore believe it prudent to seek Corning's consent to GHR's representation of the Claimant Entities.

LMC Deposition Exhibit 20, GHR 0297. Mr. Eggers via e-mail dated June 16, 2003, directed to Judith A. Barbee, who forwarded it to Bette M. Orr and Scott D. Gilbert, wrote:

> We are reviewing and discussing with our outside counsel whether the content and format as proposed would be appropriate. Items to consider—explicit definition of what roles the Gilbert firm will have and will not have (i.e., nothing adverse to Corning; no use of any information acquired in the course of representing Corning; no role in connection with the terms of the Corning deal with the ACC) and explicit agreement to protect the confidentiality of all information acquired in the course of representing Corning. I am not prepared to sign in the form faxed to me, but we will consider alternatives.

LMC Deposition Exhibit 21, GHR 0300. On June 20, 2003, Mr. Gilbert wrote the following to Mr. Eggers:

We anticipate that we will be advising and representing the Claimant Entities in much the same capacity as we have advised Corning, namely by advising the Claimant Entities on the most effective way to recover those insurance assets that will be assigned to the Asbestos PI Trust, and we would then pursue directly the recovery of such assets.

LMC Deposition Exhibit 22, GHR 0397.

We find that there is more than a possibility of a conflict—an actual conflict exists and the potential for a conflict in the future is so great as to be a near certainty because GHR is representing its former client's adversaries, the ACC and the FCR, with respect to the same matter. Furthermore, the interests of the ACC and the FCR are not identical and are likely to conflict with each other and with the interests of the post-confirmation Asbestos PI Trust as illustrated below.

*The Interests of the Parties*

The parties in interest represented by the ACC assert that Corning, among others, is liable for asbestos-related injuries. The FCR represents future claimants who, when they are found to exist, are likely to take the same position. Without the settlement Corning reached with the Claimant Entities, Corning would be defending those claims. Absent confirmation of the proposed plan, the Corning settlement will not be final and Corning will once again be in the position of having to defend against those claims.

It is asserted by Lumbermens that Corning is obligated under relevant insurance policies to cooperate in the defense of claims and we assume for purposes of this Memorandum Opinion that this is true. The insurance companies have an interest in utilizing Corning's cooperation in the defense of claims that the insurers may be called upon to pay. In this respect both Corning and its insurers have an interest in defending liability and minimizing damages. The Claimant Entities' interest is in getting payment for asbestos plaintiffs' injuries. Corning decided that it was in its best interests to settle with the ACC and the FCR. Corning's interest therefore will change upon plan confirmation—it will have no liability other than that provided by the plan as to any issues with respect to asbestos plaintiffs or as to settling insurers. Until the settlement is approved as part of plan confirmation, however, Corning's interests remain adverse to the claimants represented by the ACC and the FCR. Until plan confirmation, the settling insurers' interests will not change. Moreover, Corning's and the Claimant Entities' interests will remain adverse, even after plan confirmation, with respect to the non-settling insurers. Corning reserved its rights under policies held by non-settling insurers, including Lumbermens, and those interests remain unchanged pre– and post-confirmation.

Corning originally retained GHR to advise it with respect to

claims it has, or may have, against its insurers for asbestos-related coverage, either on its own behalf or in connection with its partial ownership of Pittsburgh Corning" . . . . . We advised Corning on how its insurance asset could be utilized in the Pittsburgh Corning bankruptcy to resolve Corning's pending and future asbestos-related claims. Although [ ] we provided strategic advice to Corning concerning insurance coverage for its asbestos-related claims, we did not represent or advise Corning in the defense of the underlying litigation.

LMC Deposition Exhibit 20, GHR 0296–97. The limited waiver that was eventually signed on June 20, 2003, provides that GHR anticipates that it

... will be advising and representing the Claimant Entities in much the same capacity as we have advised Corning on insurance matters, namely by advising the Claimant Entities on the most effective way to recover those insurance assets that will be assigned to the Asbestos PI Trust, and we would then pursue directly the recovery of such assets. We will not, in the course of our representation of the Claimant Entities, represent them in litigation against or negotiations with Corning prior to the effective date of a confirmed PC Plan. Nor will we provide counsel or advice to the Claimant Entities in the pursuit or establishment of any asbestos-related liabilities alleged against Corning. This is consistent with GHR's practice of strictly limiting any representation for asbestos claimants or claimant committees to insurance matters.... Corning consents to this representation ... and waives any and all potential conflicts that may result from the Firm's prior representation of Corning subject to the limitations stated herein.

LMC Deposition Exhibit 22, GHR 0398, Letter of June 20, 2003, from Scott D. Gilbert of GHR to William D. Eggers on behalf of Corning. In the same letter, Mr. Gilbert wrote

Although we provided strategic advice to Corning concerning insurance coverage for its asbestos-related claims, we did not represent or advise Corning in the defense of the underlying litigation.

*Id.* As this court sees it, "strategic advice" is an essential component of any defense of the underlying claims.

In order to establish insurer liability, the ACC and the FCR will have to claim against Corning or the Corning Fund that is to be established under the plan. Plan confirmation will not fix Corning's non-settling insurers' liability, it will only establish that claims against Corning will be directed to the trust. In the event there is coverage litigation post-confirmation, Corning will be obliged to cooperate in the defense of claims if its contracts with its insurers so provide. GHR represented Corning with respect to "strategic advice" regarding asbestos liabilities. That advice necessarily is geared to defense of the liabilities. GHR will be in direct conflict with Corning's interests when representing the ACC or FCR and/or, as proposed, the Asbestos PI Trust post-confirmation.

*Joint Defense Doctrine and Whether Lumbermens' Consent to Representation is Required*

■■■ Even if GHR's retention application were to be approved, Lumbermens' consent to the representation is unnecessary.

Generally, a client waives the attorney-client privilege when it voluntarily discloses privileged communications to a third party.... The "common interest"[13] or community of interest doctrine is an exception to this general rule.... Under the doctrine, "parties with shared interest in actual or potential litigation against a common adversary may share privileged information without waiving their right to assert the privilege".... The nature of the parties' common interest, however, must be "identical, not similar, and be legal, not solely commercial."

*Russo v. Cabot Corp.,* No. 01–2613, 2001 WL 34371702, at *2, 2001 U.S. Dist. LEXIS 23861, at *6—*7 (E.D.Pa. Oct. 26, 2001), reversed on other grounds *sub nom.*

**13.** The joint defense doctrine, a/k/a the "common interest doctrine", asserted here involves discovery disputes that are intertwined with the issues surrounding the opposition to the retention of GHR.

*Debiec v. Cabot Corp.*, 352 F.3d 117 (3d Cir.2003).

 Under the joint defense doctrine, the joint defendant also must consent to a waiver of the conflict for the waiver to be effective. *Pittston Co. v. Allianz Insurance. Co.*, 143 F.R.D. 66, 69 (D.N.J.1992). *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir.1986). To establish existence of the joint defense privilege "the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." *Id.* The party moving to disqualify a firm on the basis of a conflict of interest bears the burden of proving both elements of the two-prong test and that the conflict was not waived. *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984); *Brennan v. Independence Blue Cross*, 949 F.Supp. 305, 307 (E.D.Pa.1996).

In *Russo*, Cabot Corporation sold its beryllium manufacturing business and plant to NGK Metals, but remained partially liable to NGK for future injury claims against NGK. Years later, NGK's employees sued NGK and Cabot for exposure to beryllium products developed and manufactured at the plant. The United States District Court for the Eastern District of Pennsylvania held that Cabot and NGK were joint defendants because they clearly shared a legal interest since the suit sought to establish the liability of both NGK and Cabot, not just NGK. The court also noted that Cabot's and NGK's common interest had been "recognized and formally established in" an agreement be-

tween the parties. 2001 WL 34371702, at *2, 2001 U.S. Dist. LEXIS 23861, at *7.

Here, Corning and Lumbermens share an interest in defending Corning against asbestos liability. However, even if there were an adjudication that Corning is liable for an asbestos-related injury, such a ruling would not be an adjudication that Lumbermens is required to pay the claim. Lumbermens' obligation would be determined by application of the insurance contract provisions. Thus, Lumbermens' consent to waiver of the conflict is not required.[14] To be joint defendants under the joint defense doctrine, parties must have identical, not just similar, interests in a lawsuit and must have exchanged confidential information. *Russo v. Cabot Corporation, supra*, 2001 WL 34371702, at *2, 2001 U.S. Dist. LEXIS 23861, at *7; *Pittston Co. v. Allianz Insurance. Co.*, 143 F.R.D. 66, 69 (D.N.J.1992). Although Lumbermens' and Corning's interests in litigating the asbestos cases based upon their contractual duties and responsibilities to each other are similar, they are not identical. In fact, their legal interests have been adverse regarding their legal positions in this bankruptcy. In June of 2001 and in 2002, Corning tried to convince Lumbermens to contribute to the Asbestos PI Trust. Lumbermens was, and still is, opposed. Corning wanted to contribute to the trust to avoid defending itself against future claims. Lumbermens wanted only to resolve current claims, not contribute defense dollars to the Asbestos PI Trust.

We also note that Lumbermens did not provide confidential information in the

---

14. To further illustrate the disparity in interests, the court notes that the insurers have raised the argument that by facilitating GHR's representation of Corning's adversaries (those represented by the ACC and the FCR) Corning has left itself open to a charge that it has undermined its duty to cooperate with its insurer(s) or its duty to assist in the defense of claims brought against it. If the insurers prove this assertion in coverage litigation, it may affect their obligation to pay under the policies.

course of the negotiations predating GHR's assumption of representation of the ACC and the FCR. Whereas Corning provided Lumbermens with a confidential memo about the Unibestos-related claims, Lumbermens apparently never provided Corning with any confidential information regarding the suits. Lumbermens has not even asserted that it and Corning exchanged confidential information regarding the individual asbestos claims. Therefore, the common interest/joint defense doctrine does not apply to require that Lumbermens consent to the representation.

*Conflict of Interest*

■ There is a two-prong test with respect to conflicts of interest. *See generally International Longshoremen's Ass'n Local Union 1332 v. International Longshoremen's Ass'n,* 909 F.Supp. 287 (E.D.Pa.1995). The first element is substantial relation of the prior and present matters. Matters are substantially related "when an attorney might have acquired confidential information as counsel in one matter which is also relevant to the other matter." *Id.* at 291. The second element, that the former and proposed current clients have materially adverse interests, is also met. The individual asbestos claimants represented by the Claimant Entities, GHR's proposed current client, sued Corning, GHR's former client, asserting liability and damages for asbestos-related injuries. Notwithstanding the settlement Corning has reached with respect to its contributions to the § 524(g) trust, a plan has not been confirmed, the contributions have not been made, and a § 524(g) injunction has not been entered. GHR is in the position of representing one client against a former client with respect to the same liabilities.

*Substantial Relation*

■ The substantial relation test entails the determination of (1) whether the subject matter of the former and current representations are the same and (2) whether the attorney might have acquired confidential information related to the subject matter of the present action.

With respect to the acquisition of confidential information, it is clear to the court that GHR acquired confidential Corning information related to the subject matter of the Claimant Entities' actions against Corning. Corning's limited waiver of the conflict is not effective to permit employment of GHR by the ACC and the FCR as to Corning's insurance. GHR cannot represent both sides in what amounts to the same dispute. *Brennan v. Independence Blue Cross,* 949 F.Supp. 305, 308 (E.D.Pa. 1996). In *Brennan,* counsel's representation of the Brennans against the insurer defendants occurred after settling an underlying medical malpractice action in which counsel represented both the Brennans regarding their tort claims and the defendants concerning their subrogation right. The underlying medical malpractice action included a claim for future medical benefits. The court found that a conflict existed inasmuch as counsel was seeking to represent the Brennans in their claims against the defendant insurers for the same medical benefits at issue in the medical malpractice action. In the matter at bench at least a potential conflict exists and the representation cannot go forward. Although Corning and the ACC and the FCR have settled, that settlement is contingent on plan confirmation. If the plan is not confirmed, the settlement will not become effective.

In the matter at bench, Mr. Gilbert and Ms. Orr of GHR met with Corning and Corning's insurers at least four times to discuss Corning's defense strategies against the Claimant Entities, the ACC's demands on Corning, and Corning's will-

ingness to contribute to the Asbestos PI Trust. Further, Mr. Gilbert obtained a confidential memo from Corning's other counsel that contained detailed facts and law about the underlying Unibestos-related claims against Corning.[15] We find that GHR would be disqualified even if Corning executed a blanket waiver due to the nature of the conflict.

*Materially Adverse Interests*

To avoid conflicts of interest among an attorney's clients, Rule 1.9 of the Pennsylvania Rules of Professional Conduct prohibits an attorney from representing a client in the same or substantially similar matter in which that client's interests are materially adverse to those of the attorney's former client, unless the former client consents after full disclosure of the circumstances.[16] Likewise, a firm cannot represent a client when any of its attorneys practicing alone would be prohibited from doing so. Pa. R. Prof. Conduct 1.10(a). For the reasons stated, the interests of GHR's former and proposed clients are materially adverse and so the retention application must be denied.

▆▆▆▆ A federal court has the inherent power to supervise the conduct of attorneys practicing before it. *In re Corn Derivatives Antitrust Litig.*, 748 F.2d at 160; *Clark Capital Mgmt. Group, Inc. v. Annuity Investors Life Insurance Co.*, 149 F.Supp.2d 193, 198 (E.D.Pa.2001). It may disqualify a firm from representing a client where a conflict of interest arises. *Clark Capital Mgmt. Group*, 149 F.Supp.2d at 198. However, a court should disqualify a firm only when it determines, on the particular facts of the case, that disqualification is an appropriate means of enforcing Rule 1.9. *Id.* The court must weigh the objectives of Rule 1.9, which include maintaining the public's confidence in the bar, fulfilling the former client's expectations that attorneys will be loyal to their clients, and preventing the possibility that a client's secrets will be used against him, against any countervailing policies such as permitting the litigant to retain counsel of his choice. If disqualification is inappropriate, the court may screen attorneys to remedy the conflict. *Id.*

▆▆▆▆ The comment to Rule 1.9 also provides a comparison with the Disciplinary Rules of the Code of Professional Responsibility, noting that the problem stated in Rule 1.9(a) has sometimes been dealt with under Canon 9 of the Disciplinary Rules.

---

**15.** At the hearing on September 15, 2003, there were allegations by insurers that GHR has already breached Corning's confidentiality. However, Corning did not raise it and so we need not address it or make findings regarding this point.

**16.** Rule 1.9 regarding conflict of interest in relation to a former client provides:

A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6

would permit with respect to a client or when the information has become generally known.

The comment to Rule 1.9 provides in part: After termination of a client-lawyer relationship, a lawyer may not represent another client except in conformity with this Rule. The principles in Rule 1.7 determine whether the interests of the present and former client are adverse.... The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.... Disqualification from subsequent representation is for the protection of clients and can be waived by them.

Canon 9 provides that "A lawyer should avoid even the appearance of professional impropriety." However, the Court of Appeals of the Third Circuit has made it very clear that the appearance of impropriety alone is not sufficient to disqualify counsel. *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir.2002). The comment to Rule 1.9 further provides that the scope of Rule 1.6(a) concerning the revelation of information about a client is broader than "confidences and secrets" included in EC 4–6 and, therefore, the extent to which an attorney may use information about a client after termination of the attorney-client relationship must be determined. In this case the issues and the parties are so inter-related and inter-dependent that the parameters cannot be defined. The representation cannot be permitted to go forward.

▬▬ Even GHR admits the "possibility" of a conflict. *See* Letter of June 11, 2003, from Scott D. Gilbert of GHR to William Eggers, Senior Vice President and General Counsel of Corning Inc., LMC Deposition Exhibit 20, GHR 0296, attached as an exhibit to Lumbermens' Objection to GHR Retention Application. The ACC and the FCR have fiduciary duties to *each* present and future asbestos creditor, respectively. Moreover, some individual asbestos creditors may actually litigate, at which point the Asbestos PI Trust, having succeeded to Corning's interests, will be represented by Corning's former counsel against the interests of the ACC and the FCR. The objective of the ACC and the FCR focuses on settlements and administrative resolution of claims rather than litigation in order to preserve available funds for qualified asbestos creditors. However, the objective may not be 100 percent attainable and, to whatever extent the goal is not met, litigation may ensue. In *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157 (3d Cir.1984), the Court of

Appeals noted that "[t]he duty of loyalty [to a former client] does not always detach when the representation ends.... In litigation, an attorney may not abandon his client and take [an] adverse position in the same case. This is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client." *Corn Derivatives*, 748 F.2d at 161. Referring to ABA Model Rule of Professional Conduct 1.9 as it existed at the time, the Court of Appeals went on to say:

A rule against representation of interests adverse to a former client in the same or substantially related litigation has several purposes. It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar.... Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

748 F.2d at 162. We note that the Court of Appeals did not reach the issue of whether circumstances could exist "where even the consent by the former client will not immunize an attorney against a disqualification based upon the appearance of impropriety and the maintenance of the integrity of the bar." *Id.* Later, however, as stated above, in a series of cases, the court indicated that the appearance of a conflict alone is insufficient to disqualify counsel. *See In re Pillowtex, Inc.*, 304 F.3d 246 (3d Cir.2002); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998); *In re BH & P, Inc.*, 949 F.2d 1300 (3d Cir.1991). However, there is a *per se* disqualification imposed by 11 U.S.C. § 327(c) on an attorney who has an actual conflict of interest. In addition, it is with-

in the court's discretion to disqualify counsel who has a potential conflict of interest, pursuant to § 327(a) and consistent with § 327(c). *In re Pillowtex, Inc.*, 304 F.3d at 251. The requirements of § 1103 pursuant to which the application was made in this case are the same as those under § 327—the professional must not have an adverse interest and must be disinterested. *See In re Metropolitan Hospital*, 119 B.R. 910, 919 (Bankr.E.D.Pa.1990). GHR wants to represent the ACC and the FCR whose constituencies' claims, and the insurance issues surrounding them, are the very reasons Corning hired GHR in the first place. We find an actual conflict but to the extent there is not an actual conflict at this point, we find the potential for conflict is so great as to be a near certainty and therefore to warrant the exercise of our discretion to disqualify GHR from the multiple representation it seeks.

 Corning has provided a limited waiver of GHR's conflict. Even if Corning waived the conflict in its entirety, however, GHR retains an obligation to keep confidential those matters covered by the attorney-client and work-product privileges. GHR cannot comply with that obligation *and* exercise its ethical and fiduciary obligations to the ACC and FCR, regardless of intent or effort to do so. GHR cannot serve two masters, let alone three or four (Corning, the ACC, the FCR, and/or the Asbestos PI Trust). GHR was Corning's insurance counsel. GHR has been represented to the court to be PPG's insurance counsel. Like Corning, PPG is a shareholder of the Debtor. It has also been represented to the court that GHR would be paid nothing more, if this application were approved, to represent the ACC and the FCR than it will be paid to represent the Asbestos PI Trust regarding PPG's insurance contributions. However, cost savings cannot justify representation by counsel with a conflict of interest. There is

necessarily tension between and among the interests of those represented by the ACC and those represented by the FCR and the Asbestos PI Trust. GHR cannot successfully or ethically represent all entities in the same matter regarding the same issues and claims.

The subject matter of the former and current representations is the same in this case where the reasons for retaining counsel and the tasks that the firm performed in the former representation correspond to the issues and underlying facts of the current proposed representation. *Commonwealth Insurance. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1204 (E.D.Pa. 1992). The subject matter of GHR's former representation of Corning is the same as its current representation of the Claimant Entities. That is, Corning retained GHR to provide advice and strategy in its effort to settle insurance coverage disputes with Corning's primary insurers. The Claimant Entities retained GHR to provide advice and strategy with respect to collecting Corning's insurance coverage for the Claimant Entities' individual asbestos claimants. The asbestos-related issues GHR faces in the representation of both its former and current clients concern Corning's liability, that of its insurers, and insurance coverage in the asbestos suits. Therefore, under *Graphix Hot Line, Inc., supra*, the subject matter of GHR's former representation of Corning and its current representation of the Claimant Entities is the same—advice regarding issues related to Corning's insurance coverage for asbestos-related claims, the same issues with respect to which GHR seeks to represent the Claimant Entities.

Although the insurers' express concern that Corning's defense strategies (proposed in a confidential memorandum by Corning's counsel) to which GHR is privy will be used against them in future litiga-

tion with the ACC and the FCR, those defense strategies could be used by Corning in any event. The relevant focus is on Corning, inasmuch as GHR's duties regarding the ACC and the FCR are stated to be to assist and advise the ACC and the FCR in the analysis of Debtor's and its shareholders' (of which Corning is one) potentially available insurance assets. *See* Retention Application, Dkt. No. 2345, at ¶ 18. That determination requires an analysis of Corning's potential defenses to liability. GHR cannot make that analysis for the ACC and the FCR without violating its obligations to Corning. *See* Letters of June 11, June 16, and June 20, 2003, *supra.*

It is argued that the representation must be permitted because GHR (1) represented Corning with respect to Corning's insurers and not in negotiations with the ACC, Retention Application, Dkt. No. 2345, at ¶ 16, (2) has never represented Corning in the bankruptcy in a manner directly in conflict with the ACC, Affidavit of Cheryl A. Heller, Esq., Exhibit A to Lumbermens Mutual Casualty Company's Motion to Disqualify Gilbert Heintz & Randolph LLP as Counsel to the [ACC], the [FCR] and the Proposed Asbestos PI Trust, Dkt. No. 2284 (hereafter Heller Affidavit), and (3) would not violate its obligation to preserve confidential information obtained from Corning during the course of the representation. On a theoretical level, and acknowledging the integrity of counsel, the argument is reasonable. On a practical level, it is unrealistic to expect that confidential information of the nature involved in this case can be kept confidential or that a conflict does not exist and will not arise in the future. First, "direct conflict" does not appear in any of the

authorities examined by the court and the parties in favor of GHR's retention repeatedly assert that GHR has been and will continue to be adverse to Corning's insurers. Adversity to the insurers is not the linchpin, however. The test is actual or potential conflict with respect to Corning, the former client.[17] *See In re Marvel Entertainment, supra.* Second, even if an actual conflict did not exist, the potential for conflict is great because the claimants represented by the ACC and the FCR have already asserted or may in the future assert claims for asbestos liability against Corning. GHR was involved in Corning's defense against these same claimants, regardless of the gloss that those arguing in favor of GHR's retention may put on the matter.

It is also proposed that GHR may represent the Asbestos PI Trust after plan confirmation which would also place GHR in a conflict position inasmuch as it is the Asbestos PI Trust that will be dealing with claims after plan confirmation. The Asbestos PI Trust and the ACC and/or FCR may not agree with respect to payment of certain claims which would further complicate GHR's ability to represent former or proposed clients consistently with the rules governing professional conduct. Third, the waiver executed by Corning was limited:

> Corning agreed to waive any objections it might otherwise have had to GHR and [Scott] Gilbert representing ACC, FCR, and others, but only to the extent that such representation did not involve the pursuit or establishment of any asbestos-related liabilities against Corning and did not involve the disclosure of

---

**17.** Inasmuch as we find that Lumbermens' interests do not fall under the common interest or joint defense doctrine, any interest adverse to Lumbermens' interests does not play a role in our decision.

information that was confidential to Corning.

Heller Affidavit, Dkt. No. 2284, at ¶ 15.

Although the appearance of impropriety alone is not a permissible basis upon which to disqualify counsel,[18] in this case the impropriety goes much farther than appearance.

Nonetheless, one can only surmise what would be the reaction of an asbestos claimant, who alleges that his injury was caused by Corning, when he realizes that counsel hired by his court-appointed representative once was insurance counsel for the company he is suing and that counsel was privy to confidential information as to how Corning intended to defend against his suit, minimize any recovery to be paid, and assist the insurance company in defending against his suit and claim for damages. When the asbestos claimant further learns that that same counsel will be paid $30 million, without court supervision, by Corning's co-shareholder in the Debtor, the suspicion that counsel has the best interest of Corning in mind rather than that of the asbestos claimant will be heightened. The result is an unacceptable taint that will disrupt the resolution of claims and foster distrust among the real parties in interest—the asbestos claimants and their fiduciaries, the ACC and the FCR. Counsel is required by professional rules to avoid the appearance of impropriety. It is required to avoid conflicts of interest. These things it cannot do if it undertakes the proposed representation. Moreover, as stated repeatedly herein, actual and potential conflicts of interest exist which dictate that the application to retain GHR be denied.

Ms. Heller asserts in her affidavit that GHR's role when employed by Corning was to assist Corning with negotiations with its carriers, ¶ 9, GHR did not hold itself out as representing Corning in the underlying asbestos actions pending against Corning, ¶ 10, was "not involved in the defense of any particular asbestos claims on behalf of Corning, ... not involved in formulating the strategy for defending any particular asbestos cases, and Corning did not share liability-related facts regarding the defense of *individual* cases" with GHR. Heller Affidavit, Dkt. No. 2284, at ¶ 12. That the representation was not specific to any individual asbestos action is a distinction without a difference and is not dispositive, if even relevant. GHR was privy to Corning's defense strategy in general, Corning's view of its liability, and other related matters. To the extent that asbestos claimants will be pursuing non-settling insurers, GHR's prior work for Corning will place it in a conflict position. The waiver executed by Corning provides that Corning will not object to Scott Gilbert's and GHR's representation of "the ACC, FCR and other interests *to the extent they were not otherwise precluded from doing so by reason of their ethical or legal responsibilities*". *Id.* at ¶ 14. The problem with retention of GHR by the ACC and the FCR (and later the Asbestos PI Trust) is that counsel's legal and/or ethical responsibilities to avoid conflicts of interest will be violated. While the court is certain that counsel and the firm would not intentionally breach Corning's confidence or otherwise violate legal and ethical responsibilities, we are convinced that the conflict cannot be avoided, regardless of good intentions.

---

**18.** *In re Pillowtex, Inc.,* 304 F.3d 246 (3d Cir.2002); *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 476 (3d Cir.1998)("the district court may not disqualify an attorney on the appearance of conflict alone").

Counsel for GHR asserted that as of the time of the argument direct adversity between either two current clients or a current and former client did not exist. We disagree.[19] Further, although the goal may be the same—i.e., to maximize insurance proceeds—where an actual conflict exists, the employment cannot be approved. Furthermore, the court must look at the potential for conflicts and here it is great. GHR represented Corning, a shareholder of Debtor. GHR's stated proposed duties include analysis of Corning's potentially available insurance assets which of necessity include assessment of Corning's liability. To state the obvious, no insurance is available if Corning is not liable for an injury covered by the policies. GHR was privy to Corning's asbestos defense strategy. It cannot do the job for the ACC or FCR without violating, however unintentionally, its obligations to Corning, its former client.

■ Corning and the Claimant Entities have materially adverse interests, meeting the second conflict of interest element, notwithstanding Corning's agreement to contribute to the Asbestos PI Trust in order to obtain the benefits of an injunction through the plan confirmation process. Plan documents and plan related insurance matters remain to be finalized, increasing the potential for prejudice to either or both GHR's clients in the form of future conflicts due to GHR's dual representation. Former and current clients have materially adverse interests where the current client sued the former client. *Cf. Interna-*

*tional Longshoremen's Ass'n, supra,* 909 F.Supp. at 291 (former client sued current client). The individual asbestos claimants represented by the Claimant Entities, GHR's current client, sued Corning, GHR's former client, for Unibestos-related and Corhart-related injuries. Although Corning has theoretically settled its issues and so is removed from the litigation in that regard, the plan has not been confirmed. If it is not confirmed, the agreement by which Corning will resolve its asbestos liabilities through a trust contribution will not take effect and the parties will be left to other remedies which include returning to the tort system for continued litigation.

### The Proposed $30 Million Payment to GHR by PPG

There is a further issue to be addressed and that is the proposed payment by PPG to GHR[20] of $30 million, ostensibly to pursue the insurance that PPG proposes to assign to the Asbestos PI Trust. It is apparent from an examination of the Term Sheet agreed upon in this regard that the representation goes far beyond PPG's insurance issues. At the hearing on September 15, 2003, counsel for the ACC represented to the court that the ACC and the FCR want GHR to provide advice to them regarding plan related insurance matters that have to be addressed in the final versions of the plan documents and for confirmation. Under the agreement that the ACC and the FCR reached with PPG, PPG, a nondebtor and a shareholder

19. We also note that in his Verified Statement in support of the retention application Scott Gilbert averred that before GHR was formed he represented the Asbestos Claims Facility of which Debtor was a member. Verified Statement of Scott D. Gilbert, Exhibit to Retention Application, Dkt. No. 2345, at ¶ 26. He stated that he does not "believe that this prior representation will interfere with or impair

... professional judgment....". *Id.* While we credit his statement concerning his belief, the prohibitions contained in rules governing professional conduct exist because it is not always possible to fulfill even the best intentions.

20. This commitment was negotiated by the ACC with the FCR's knowledge and consent.

of the Debtor PCC, will pay a flat fee of $30 million to GHR to represent the ACC, FCR and the postconfirmation Asbestos PI Trust (if the Asbestos PI Trust chooses to use GHR).

██ The agreement provides for court approval of the payment but also states that retention of GHR and payment to it will not be dependent on court approval. The retention and payment of professionals by authorized committees and the FCR are the subject of § 327, 328, § 330, and § 331. Pursuant to those sections, it is the statutory obligation of attorneys who wish to be retained to establish their qualifications, including disinterestedness. Without first doing so, GHR cannot be authorized to represent any entity in this case nor to accept a fee or payment for its services in this case from any entity. *See also* 11 U.S.C. § 1129(a)(4)(requiring court approval of certain payments for services, costs or expenses in or in connection with the case or the plan).

We further note that the agreement provides for fee sharing between GHR and Kenesis Group, LLC, a consulting firm providing financial and insurance-related services to assist clients in insurance-related asset and liability management. GHR is a majority shareholder of Kenesis. Section 504 of the Bankruptcy Code prohibits professionals from sharing compensation. Because GHR's employment and payment are not approved we need not reach the issue of whether § 504 would apply where payment of the professional is not made by the estate.

*Conclusion*

For the reasons stated above, GHR has an actual conflict of interest and the potential for conflicts in the future that preclude its retention. In addition, the payment proposed is prohibited whether or not the retention is approved.

Because Lumbermens has not established entitlement to the protections of the common interest or joint defense doctrine, its motion to compel production of documents in connection with the application to employ GHR will be denied as moot. To the extent the motion to compel seeks production of draft plans of reorganization or draft disclosure statements, the motion is denied.

An appropriate order will be entered.

## ORDER DENYING APPLICATION TO EMPLOY GILBERT HEINTZ & RANDOLPH LLP AS SPECIAL INSURANCE COUNSEL AND DENYING IN PART THE MOTION TO COMPEL PRODUCTION OF DOCUMENTS (NUMBER TWO) FILED BY LUMBERMENS MUTUAL CASUALTY COMPANY

**AND NOW, this 27th day of April, 2004, it is ORDERED that the Application to Employ Gilbert Heintz & Randolph LLP as Special Insurance Counsel to the Official Committee of Unsecured Asbestos Creditors and the Future Claimants' Representative Pursuant to § 1103(a), Docket No. 2345, is DENIED.**

**It is FURTHER ORDERED that the Motion to Compel Production of Documents (Number Two) Filed by Lumbermens Mutual Casualty Company, Docket No. 2409, is DENIED,** *provided, however,* that those documents that the ACC and/or the FCR previously agreed to produce shall be produced forthwith, to the extent the documents are not subject to a privilege or have not been produced previously. To the extent the motion to compel seeks production of draft plans of reorganization or draft disclosure statements, the motion is **DENIED.**